UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION at LAFAYETTE

| KRISTINA COOPER, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | 4:12-CV-11 PS |
| INDIANA UNIVERSITY HEALTH ARNETT, INC., | ) | |
| Defendant. | ) | |

## OPINION

Kristina Cooper believes her employment with Indiana University Health Arnett was terminated because she made a complaint to the U.S. Department of Labor about a wage and hour issue. A bench trial was held before this Court on April 21-22, 2014. For the reasons stated below, judgment is in favor of IU Health and against Cooper.

The following are the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). To the extent certain findings of fact may be deemed to be conclusions of law, they shall also be considered the Court's conclusions of law. Similarly, to the extent matters contained in the conclusions of law may be deemed findings of fact, they shall also be considered the Court's factual findings.

## FINDINGS OF FACT

Cooper brought this suit against IU Health for their alleged firing of her in retaliation for making a complaint to the Department of Labor about a wage and hour

issue.[1] The Fair Labor Standards Act prohibits employers from discharging "any employee because such employee has filed any complaint" about the employer's failure to properly pay overtime wages. 29 U.S.C. § 215(a)(3).

IU Health Arnett operates a hospital in Lafayette, Indiana. The hospital was opened in 2008, and is therefore relatively new. As with most hospitals, IU Health Arnett has a full time pharmacy within the confines of the hospital. The pharmacy serves as the source of all drugs distributed to patients of the hospital. Shortly after the hospital opened, Edward Leung was appointed director of the pharmacy. When Leung arrived at the hospital, the pharmacy was woefully understaffed. Pharmacist positions were only 40% staffed and the pharmacy was not performing particularly well. The operations of the pharmacy were inefficient, drugs were not being dispensed in a timely way and delivery times were not optimal.

Kristina Cooper was hired by IU Arnett as a pharmacy technician in March 2009. Cooper was licensed by the State of Indiana and took the job at IU Health because it paid more money than her prior job working at a pharmacy in Brownsburg, Indiana. Cooper went through a training program at IU Health and during that time she worked all shifts. But once her training was over, she was assigned to the night shift. Generally the night shift ran from 7:00 pm through 5:00 am the following day. The shifts were scheduled seven days on, seven days off. Cooper reported to Tony Hansen, the supervisor of pharmacy techs. But because Cooper worked the night shift, and she was

---

[1] These Findings of Fact are being written without the benefit of a transcript. They are based on my recollection of the evidence and the copious notes I took during trial.

the only tech on duty during that time, she took her day-to-day direction from the pharmacist on staff during the night shift, Suree Lee.

IU Health uses a computerized time and attendance program called Kronos. Pharmacy techs like Cooper were all hourly employees. They were required to log into the Kronos system upon arrival to work and to log out when they left. When Cooper first started working at IU Health in March 2009 the Kronos system would automatically deduct ½ hour for lunch. So employees were expected to take their lunch break and the computer would automatically deduct the time. If an employee had to work through lunch, then the Kronos system required someone to manually change the report to show "no lunch" and this would thus trigger overtime compensation. When Cooper first started at IU Health, the techs were allowed to enter the "no lunch" code themselves. But in April 2009, IU Health changed the policy. (Pltf. Ex. 2). Because management perceived that too much money was being spent on overtime, the policy was changed so that only a supervisor could enter "no lunch" into the system.

A meeting was held in the pharmacy to announce the change in policy. Cooper says that she raised a concern at the meeting about having to work through her lunch hour and not getting paid for it. Neither Leung nor Hansen had any recollection of this, and I find them to be more credible than Cooper on this point. Cooper claims that there were ten other people present during the meeting when she made these comments to Leung, but curiously, none of them was called to testify. Many exhibits were admitted into evidence at trial which show that Cooper had no hesitancy to raise complaints

3

about various issues in the pharmacy. *See examples discussed infra, p.9.* Yet there isn't a single email regarding the subject of her having to work through her lunch hour and expressing concern about this.

According to Mr. Leung, whom I found to be utterly credible, Cooper was not a particularly effective pharmacy tech. Although he never had to formally write her up, he did give her verbal warnings regarding a number of shortcomings, including mistakes that she made with respect to compounding of drugs, disappearing from the pharmacy at night, not helping with various tech responsibilities, not paying attention to details, and not being willing to ask questions and then making mistakes. (*See e.g.* Def. Ex. L). Although other pharmacy techs made similar mistakes, Cooper's mistakes were more frequent.

David George took over for Edward Leung as Director of Pharmacy at IU Health Arnett in late July 2009. George has a bachelor's degree in pharmacy from Purdue University and a Masters in Business Administration from Indiana University's Kelley School of Business. He has received training in issues concerning wage and hour laws on topics including who is an exempt employee and who is not for purposes of overtime pay provisions.

George first met Cooper when he came on board at IU Arnett in July 2009. At that time, pharmacy techs were supposed to take a "duty free" lunch break. They could eat lunch in the pharmacy, go to the hospital cafeteria, or go to an adjacent break room that the pharmacy shared with the hospital laboratory. Eventually a break room was

4

created within the pharmacy area itself with a television, refrigerator and microwave. The break room was created because a pharmacist is required to be in the pharmacy at all times. This presented problems for the overnight shift because the pharmacy was staffed with just a pharmacist and one tech. And if the pharmacy tech was out making deliveries of drugs in the hospital, the pharmacist was stuck in the pharmacy with nowhere to take a break.

George credibly testified that he never received any complaint from a pharmacy tech about having to work through lunch without getting paid. George does not deny that it may have happened, but he was never aware of it. If a tech worked through lunch, then they would have to have a supervisor denote that on the Kronos system so that the tech would be paid properly. This is because, as discussed above, the Kronos system automatically deducted a ½ hour for lunch and the only way to override that was to manually change it.[2]

Tony Hansen remained Cooper's supervisor after George took over as the director of the pharmacy. Hansen reported directly to George. As the coordinator of pharmacy techs, Hansen was routinely involved in employee evaluations, but he did not have the authority to discipline employees on his own, or to hire and fire.

If there is anything that is crystal clear from the trial it is this fact: Cooper was categorically unwilling to accept the fact that Hansen was her supervisor and that she

---

[2]After Cooper was fired, the system was changed so that the automatic lunch deduction no longer occurred. Employees are now required to log in and log out of the Kronos system for lunch each day.

was answerable to him. The emails admitted at trial are replete with examples of Cooper regularly going over Hansen's head or otherwise ignoring him. (*See e.g.* Ex. T and BB). For example, on September 29, 2009, Cooper received an email from a fellow employee complaining about Cooper having made a mess in the pharmacy. Hansen was copied on the email. Yet when Cooper responded to it (denying everything), oddly it was George she copied on the response, not her direct supervisor Hansen. (*See* Ex. T). On October 14, 2009 Hansen made an effort to coach Cooper on an issue related to an error she had made while on duty. Cooper's response shifted the blame to others, and was defensive and dismissive of Hansen's efforts to coach her. (*See* Ex. W). When another pharmacy employee emailed Cooper (with a copy to Hansen) about some missing morphine on November 23, 2009, Cooper responded back without including Hansen. (*See* Ex. BB).

The most telling example of Cooper's dismissive attitude toward Hansen deals with how she kept her time. Cooper would regularly come in early, stay late or work through lunch without approval from Hansen. Doing all of these things triggered overtime. Hansen repeatedly asked Cooper to stop doing it, but she refused. The situation became almost farcical. Hansen would go onto the Kronos system and enter notes about what Cooper was doing. Cooper would then delete the notes that Hansen – her supervisor, mind you – had entered. In fact, Hansen testified credibly that the same note was removed several times by Cooper. In other words, Hansen made the note on the system, Cooper removed it, Hansen placed it back on the system, only to have it

removed again by Cooper. (*See* Ex. TT). This startling act of defiance was consistent with Hansen's general view of Cooper: she quite simply was unwilling to accept the fact that Hansen was her boss.

Cooper's difficulty in managing her time and clocking in and out appropriately became the subject of her first formal disciplinary action. On October 29, 2009, Cooper received a "Verbal Warning." The term "Verbal Warning" is a bit of a misnomer because it is in fact documented in Exhibit 10. The issue was that Cooper was lingering after her shift and then clocking out late so as to trigger overtime. Cooper was disciplined by George for clocking out too long after her shift had ended. This had happened before and Cooper had been told of the importance of clocking out promptly when her shift ended. Tony Hansen brought the matter to George's attention and George issued the Verbal warning, after verifying the situation by reviewing the Kronos records.

There was a second reason that Cooper was given the Verbal Warning on October 29, 2009: George believed that whenever Cooper was confronted with a concern from management, she responded by casting blame on others without accepting responsibility. There were several examples of this in the form of emails presented at trial. *See e.g.* Ex. T, W, and II. From George's point of view, Cooper's habit of reflexively shifting blame to others violated the IU Health's Healer's Compact (*see* Ex. 11), which mandates that employees must, among other things, be accountable for their own actions, must assume good intent on the part of others, and practice forgiveness. *Id.*

7

George presented the Verbal Warning to Cooper on October 29, 2009. From George's point of view, the meeting went well. Cooper seemed to take the Verbal Warning in stride and seemed to understand the importance of the two matters discussed. No other matters were discussed at the meeting.

Cooper tells a different story. She believes that the Verbal Warning was given to her because a couple months earlier she had complained to George about working through her lunch hour and not getting paid for it. Cooper says that this conversation with George took place in the pharmacy around August or September 2009. The details are sketchy. She says it began around the time that an email – Exhibit 4 – was sent by George which related to the importance of at least one person being in the pharmacy at all times. Cooper says that this prompted her to complain at a staff meeting about having to work through her lunch hour. She says 10-12 people were present yet she presented no other witnesses to corroborate this.

Cooper says that about a month later, sometime in early September, George approached her about some agenda items for an upcoming staff meeting. George asked her if she had any thoughts about the agenda items and whether there were any issues on the night shift that needed to be addressed. Cooper claims to have told George that she had been on the Department of Labor website and had discovered she could make a complaint about IU Health's failure to properly pay overtime. This is the statement that Cooper principally relies upon as protected activity. Cooper says that George frowned

8

at her, was obviously displeased with her, and then quickly ended the meeting. George denies that any of this took place.

I credit George's testimony in this regard. George said that there is no way that such a conversation took place, and if it had, he would have remembered it. He understood the importance of paying employees properly, and if one of his employees had mentioned that she was researching issues dealing with the Department of Labor, he would most certainly have remembered it. Cooper's story is not plausible. As I noted above, Cooper routinely emailed her bosses regarding all sorts of issues that she was unhappy with in the workplace. She showed no compunction about lodging these complaints or otherwise defending herself in writing. For example, Cooper complained about Hansen not inviting her to a staff meeting. (Ex. N). She complained to George about Hansen not including her on email chains. (Ex. MM and GG). On multiple occasions, she complained that other pharmacy techs were not doing their jobs correctly. (Ex. FF, II). There are numerous other examples of her communicating criticisms of other employees or complaining about how pharmacy matters were managed at the hospital. *See e.g.* Ex. U, W, BB and SS. And yet, on the critical issue of whether Cooper lodged a complaint about not being paid for overtime, there isn't a single shred of paper that even hints at her complaining about that issue.

Sometime in October 2009, Cooper called the Department of Labor to inquire about IU Health's policy regarding paying overtime. The DOL did not immediately act on the complaint, and it is unclear when exactly the DOL formally opened an

investigation. What is clear is that no one from IU Health was notified of an investigation until over a year later, some nine months after Cooper was terminated. Human Relations Consultant Rebecca Wells, Human Resources Director Veronica Siegle and David George all credibly testified that they were completely unaware of the DOL investigation until October 2010 when Arnett received the first DOL notice in Indianapolis. Cooper was terminated in February 2010.

About a month and a half after receiving her Verbal Warning, Cooper received her first Written Warning. (*See* Ex. 12). The warning was written on December 15, 2009 but wasn't given to Cooper until December 18th. In that Written Warning Cooper was disciplined for a number of things. First, Cooper was accused of removing labels from the portable pharmacy phones with phone numbers written on them on. One might wonder, why would someone do such a thing? According to Hansen this would be done so that a pharmacy tech could essentially "get lost" in the hospital without being tracked down. The labels with the phone numbers enabled the on-staff pharmacist to telephone the pharmacy techs while the techs were out and about in the hospital. The problem was that someone kept removing the phone numbers and it was occurring on the night shift when Cooper was the only tech on duty.

Hansen believed that Cooper was the only one who could have removed the labels because he applied the labels just prior to leaving work on the evening shift and she was the only person on staff (other than the pharmacist who had no incentive to remove the labels) during the night shift. The next morning when Hansen came into

10

work for the day shift, the labels were gone again. (*See* Ex. HH which is the exchange of emails on the subject of removing the labels). Cooper was confronted by Hansen on December 9, 2009 about removing the labels. *Id*. Cooper ignored Hansen's email for *two weeks*. It was only after she was given the Written Warning by George that Cooper finally responded to Hansen's email. Cooper's only response was that she didn't do it. *Id*.

Cooper was also written up for not finishing her work and leaving it for the next shift. (Ex. 12). Hansen credibly testified that the techs who followed Cooper were complaining to Hansen that Cooper was not finishing her work and simply leaving it for the staff on the next shift.

The Written Warning counseled Cooper about spending too much personal time on the internet. (Ex. 12). Hansen repeatedly saw Cooper online on personal matters including checking her personal email account and operating her home business from work. On cross examination, Cooper admitted using the internet while at work to check items that she had for sale on eBay, checking her personal email account, and checking the website for her home decor business.

Cooper was also disciplined in the Written Warning for being rude and disrespectful to her co-workers. In particular, Hansen had observed Cooper being disrespectful to her fellow tech Mitch Drake. Hansen also reported that Cooper was repeatedly disrespectful to himself as well as to another employee in the pharmacy.

11

Finally, George noted in the Written Warning that Cooper was continuing to not follow the proper procedure for requesting overtime approval. (*See* Ex. 12). Cooper refused to sign the Written Warning stating that she did not agree with the statements contained in the document.

A few days after the Written Warning was given to Cooper, another issue arose relating to Cooper. IU Health had a document entitled "Technician Shift Responsibilities." As the name indicates, this document listed the various responsibilities of the pharmacy techs on a particular shift. (*See* Ex. VVV). Hansen discovered that Cooper was deleting various items from the sheet so as to reduce the tasks she would have to do on her shift. When she was confronted by Hansen about altering the document, Cooper told Hansen that she didn't have to do those things, so she whited them out. This action and attitude by Cooper, as well as other matters, precipitated Cooper's Final Written Warning, given to her by George on February 17, 2010. (Ex. 17). Although the Final Warning was given to Cooper on February 17, it was written on February 4th. The delay in giving her the warning was due in part to Cooper being off work in the interim.

In the Final Written Warning, in addition to the altering of documents, George disciplined Cooper for moving file cabinets around in the pharmacy, making it difficult for staff members to effectively do their job. (Ex. 17). Cooper denied moving the file cabinets. She was also cited for being argumentative with other staff members. Finally, the Final Written Warning addressed an incident where Cooper requested paid time off

and when it was denied, she just called in and told her manager she wouldn't be in that day. (Ex. 17). Hansen credibly testified that when employees call in at the last minute, especially for the overnight shift, it causes management to scramble and makes it very difficult to find a replacement employee. It is for this reason that IU Health had a policy that employees were required to call in a minimum of 2 hours before the start of their shift. (Ex. D). Cooper refused to sign the Final Written Warning in the appropriate signature line. Instead, she wrote on the document that "The accusations contained in this document are false and I do not agree with them." (Ex. 17). She then placed her signature below that written note. *Id.*

Cooper attempted to appeal the Final Written Warning. In a letter to IU Health's Human Resources Director Veronica Siegle dated the same day she was given the Final Written Warning – February 17, 2010 – Cooper claimed that her accusers, Tony Hansen and Mitch Drake, were not credible witnesses. (Ex. 18). Cooper made a point of telling Siegle that Hansen (and former Pharmacy Director Leung) were named in her discrimination complaint with the State of Indiana Workers Compensation Board. This is a reference to an unrelated complaint that Cooper was pursuing regarding a fall that she says she took at work. It seems clear that Cooper was implying that Hansen was retaliating against her for filing that complaint. But it is important to note that the retaliation that she addresses in her appeal letter deals with *the workers compensation claim*. What is telling is that there is no reference to any issues about overtime pay or any complaint Cooper lodged with the U.S. Department of Labor.

13

After being given the Final Written Warning on February 17, 2010, later that day Cooper was scheduled to work again. Her shift would have commenced that evening. But once again Cooper failed to show up for work and failed to notify her supervisor of that fact within the two hour window. Hansen informed George of what had happened, and George made the decision to terminate Cooper's employment. (Ex. 19). The fact that Cooper did this on the very day that she was given the Final Warning was the proverbial straw that broke the camel's back.

## CONCLUSIONS OF LAW

Based on the above findings of fact, the Court hereby makes the following conclusions of law. The overtime provisions of the Fair Labor Standards Act entitle an hourly worker who works more than 40 hours per week to be paid at the rate of 1.5 times his normal wage for each hour over 40. 29 U.S.C. § 207(a). As with most employment-related statutes, the Fair Labor Standards Act has an anti-retaliation component which provides that it is unlawful for anyone "to discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter. . ." 29 U.S.C. § 215(a)(3). So if someone complains about not getting paid overtime and then gets terminated because she lodged the complaint, a claim of retaliation may be maintained under §215(a).

To prevail on her FLSA retaliation claim, Cooper has to prove the following three things: 1) that she engaged in conduct protected by the Fair Labor Standards Act; 2) that

she was subjected to an adverse employment action at the time, or after the protected activity took place; and 3) that IU Health Arnett took the adverse action against Cooper because she engaged in protected activity. *See* O'Malley, Grenig and Lee, Federal Jury Practice and Instructions, Vol. 3C, § 175.21.

Although the FLSA prohibits retaliation against only those who have "filed any complaint" or "instituted any proceeding," the Supreme Court has broadly construed these terms to include oral complaints lodged by an employee with his employer. In order to fall within the scope of the anti-retaliation provision of the FLSA, a complaint – whether it be oral or in writing – must simply "be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S.Ct. 1325, 1335 (2011).

As noted above, the anti-retaliation provision of the FLSA makes it unlawful to discharge an employee "because such employee has filed a complaint" concerning a failure to pay overtime. 29 U.S. C. § 215(a)(3). Use of the word "because" in the statute connotes a "but for" causation standard. *Reynolds v. Tangherlini*, 737 F.3d 1093, 1103 (7th Cir. 2013). Although *Reynolds* was a case under the Age Discrimination in Employment Act, there is no reason to think that the Seventh Circuit would construe the similar language of the FLSA differently. And although the Seventh Circuit has not held that specifically, that is the clear implication of cases like *Reynolds*. Other circuits have explicitly stated that the causation standard in an FLSA retaliation case is "but for." *See,*

15

*e.g., Travers v.Flight Services and Systems, Inc.*, 737 F.3d 144, 147 (1st Cir. 2013); *Kanida v. Gulf Coast Medical Personnel, LP,* 363 F.3d 568, 580-81 (5th Cir. 2004); *McKenzie v. Renberg's, Inc.*, 94 F.3d 1478, 1484 (10th Cir. 1996); *Knickerbocker v. City of Stockton,* 81 F.3d 907, 910-11 (9th Cir. 1996). So the question to be answered is whether Cooper would have been terminated if she had not engaged in the alleged protected activity and everything else had been the same. *See* Seventh Circuit Civil Jury Instruction 3.02 (2010).

Cooper has not met her burden on two elements of her claim. First, she failed to prove that she engaged in statutorily protected activity. Cooper has pointed to two meetings – one in April 2009 and one in August or early September 2009 – as the times that she complained about IU Health's failure to pay her overtime. The first time was in a meeting with at least ten other employees present in April, when Cooper claims to have raised the issue about having to work through her lunch hour without getting paid for it. Her testimony was at best hazy on the meeting. She presented no other witnesses to corroborate her statement despite the large number of people present. And the only other witness to have testified on the subject – Edward Leung – was much more credible. Leung stated that no such issue was even discussed at the meeting.

Cooper also relies on a statement that she says she made to Pharmacy Director David George in early September 2009. Cooper claims that she told George that she had been researching wage and hour issues through the Department of Labor website and had learned that employers were not allowed to deduct lunchtime from a paycheck

16

when the employee wasn't allowed to take a lunch break. George said that no such conversation ever took place. And if it had, he certainly would have remembered it. I did not believe Cooper. Cooper appears to be an inveterate record keeper. The evidence was replete with examples of Cooper sending emails and copying herself on the emails for her own records. *See e.g.* Ex. BB, HH, II, LL, FF, and GG. And yet there isn't a single shred of paper to support Cooper's story. This is a swearing contest between George and Cooper, and under the circumstances, I simply cannot credit Cooper's story. Without proof that Cooper engaged in protected activity that IU Health was aware of, Cooper cannot prevail on her retaliation claim.

In addition, suppose for the moment that Cooper did say something to George in early September about not being paid for working through her lunch break, the next question is whether her termination some five months later was caused by her complaint. That suggestion strains credulity. The record is clear that Cooper was not a model employee. As Hansen credibly testified, she was simply a very difficult person to work with. Cooper would regularly ignore Hansen's authority and go over his head. She would also persistently blame others and would not take responsibility for mistakes she made. She was also openly defiant to her boss, Tony Hansen. As shown above, she would delete entries from the Kronos system that Hansen had made. She also took it upon herself to "white out" portions of the form that listed her job duties, openly proclaiming that she didn't have to do those things. She was rude and disrespectful to her fellow employees and to her supervisor, Tony Hansen. And the record makes clear,

and her testimony at trial confirmed, an utter inability to admit to ever being wrong or mistaken. All of the issues were well documented by IU Health. In sum, even if I were to find that Cooper engaged in protected activity – and to repeat, I don't believe that happened – I cannot say that that activity was the cause of her termination. In other words, it is more likely than not that she would have been terminated anyway.

## CONCLUSION

For the reasons explained above, I find that Cooper has failed to prove that she engaged in protected activity and that even if she did, it wasn't the cause of her termination. Cooper's claim of retaliatory discharge in violation of the Fair Labor Standards Act fails.

ACCORDINGLY:

The Clerk shall **ENTER FINAL JUDGMENT** in favor of defendant IU Health Arnett, Inc. and against plaintiff Kristina Cooper.

**SO ORDERED**.

ENTERED: May 21, 2014

                                               s/ Philip P. Simon
                                               PHILIP P. SIMON, CHIEF JUDGE
                                               UNITED STATES DISTRICT COURT